IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| WILLIAM E. MELENDEZ,<br><br>Plaintiff,<br><br>  v.<br><br>QUANTUM BUSINESS ENGINEERING,<br>INC., et al.,<br><br>Defendants. | CIVIL NO. 04-1242 (CCC) |

**JOINT PROPOSED PRETRIAL ORDER
PURSUANT TO LOCAL CIVIL RULE 16(d)**

**TO THE HONORABLE COURT:**

**NOW COME** the parties, through their respective attorneys, and pursuant to

Local Civil Rule 16(d), they hereby submit this Joint Proposed Pretrial Order as follows:

**I. COUNSEL FOR THE PARTIES:**

**A. Counsel for Plaintiff**:

Plaintiff is represented in this case by:

1.      **Miguel A. Cuadros** (USDC - PR No. 114184) of:  Law Offices of

Cuadros & Cuadros, Centro de Seguros Bldg, Suite 214, 701 Ponce de

Leon Ave., San Juan, Puerto Rico 00907; Tel. (787) 725-2652; Fax:

724-3820; e-mail: mcuadros@cuad-law.com; and

2.      **Enrique A. Baez** (USDC - PR No. 214909) of: Law Office of Enrique A.

Baez Godinez,  Centro de Seguros Bldg, Suite 214, 701 Ponce de

Leon Ave., San Juan, Puerto Rico 00907; Tel. 722-5347; Fax: 724-

1

3820; e-mail baez@cuad-law.com

**B. Counsel for Defendants:**

The Defendants are represented in this case by attorney Alcides A. Reyes-Gilestra

(USDC-PR No. 211213), and attorney Kevin M. Acevedo-Carlson (USDC-PR No. 218609)

whose mailing and e-mail addresses, telephone and facsimil numbers are:

Alcides A. Reyes Gilestra
PO Box 195036
San Juan, PR 00919-5036
Telephone: (787)622-7870
Facsimile: (787)622-7871
e-mail: areyes@arglaw.net

Kevin M. Acevedo Carlson
P.O. BOX 193251
San Juan, PR 00919-3251
Tel. (787) 615-5074
Facsimile: (787)622-7871
e-mail: kacevedo@alf-ac.com

The Conference between the attorneys was held on March 22, 2004 at the Law

Offices Cuadros & Cuadros, and present were: Alcides Reyes-Gilestra, Esq., Kevin

Acevedo-Carlson, Esq., Mr. Enrique A. Baez, and Miguel A. Cuadros, Esq.

## II. NATURE OF THE ACTION AND JURISDICTION:

### A. PLAINTIFF'S STATEMENT OF THE ACTION AND JURISDICTION:

1.    The Court has jurisdiction in this case pursuant to Title VII of the

Civil Rights Act of 1964, as amended, 42 § 2000 et seq. and the

Age Discrimination in Employment Act of 1967, as amended, 29

U.S.C §§ 621, *et seq.,* as it involves a matter arising under the

Constitution, and laws of the United States, and has pendent

2

jurisdiction over the other related state law claims set forth herein.

2.     This is a discrimination case in which Meléndez claims that his employer, Quantum Business Engineering Inc. and/or Quantum Business Engineering Inc. D/B/A QSI Quantum Systems Integrator ("Quantum") discharged him because of his age.

3.     This is a discrimination case in which Meléndez claims that his employer, Quantum Business Engineering Inc. and/or Quantum Business Engineering Inc. D/B/A QSI Quantum Systems Integrator ("Quantum") discharged him because of his national origin.

4.     This is a case involving retaliation in which Meléndez claims that his employer, Quantum Business Engineering Inc. D/B/A Quantum Systems Integrator ("Quantum") and co-defendants Rafael Vidaillet, Gilberto López, Félix Ramírez and Arturo Pardo discharged him in retaliation for plaintiff's announced intention to complain to appropriate state (Commonwealth of Puerto Rico) and federal authorities regarding the utilization by all defendants of illegal foreign nationals to work in Puerto Rico in connection with services provided by defendants.

5.     Neither foreign national origin nor age under 40 are bonafide occupational requirements to fill any position or to perform any function for defendant in Puerto Rico.

6.     Plaintiff has mitigated and continues to mitigate damages by

3

pursuing such work opportunities as have been identified by him and by actively seeking new employment.

7. Plaintiff's age discrimination claim against defendants is made pursuant to the Age Discrimination in Employment Act (hereafter "ADEA"), Title 29 U.S.C. Section §§ 621, et seq., as amended.

8. Plaintiff's claims for discrimination against defendants are made also pursuant to Puerto Rico Law 100 of June 23, 1977, as amended, 29 L.P.R.A., § 146 (Law 100), and Puerto Rico Law 48 of May 29, 1973 and Puerto Rico Law 106 of June 30, 1975.

9. Plaintiff's claim for retaliation against defendants is made also pursuant to Puerto Rico Law 122, of July 12, 1986.

10. Defendants are liable to plaintiff both joint and severally for all claims herein.

11. On February 6, 2004, Plaintiff filed claims for discrimination on the basis of age, national origin, and for retaliation by employer with the Puerto Rico Office of the Equal Opportunity Commission, Charge Numbers 162-2004-00131 and 162-2004-00132.

12. The Anti-Discrimination Unit of the above-mentioned federal agency issued right to sue letters on February 13, 2004.

13. Plaintiff has complied with threshold requirements.

14. Plaintiff is resident of the Commonwealth of Puerto Rico, a male, born on March 18, 1961 in San Juan, Puerto Rico.

15. Reputedly, Quantum Business Engineering Inc. is a corporation organized and doing business under and by virtue of the laws of the Commonwealth of Puerto Rico; also doing business as QSI Quantum Systems Integrator.

16. At all relevant times, Quantum Business Engineering Inc. and/or QSI Quantum Systems Integrator are "employers" as defined in § 701 (b) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (b).

17. Rafael Vidaillet, Gilberto López, Félix Ramírez and Arturo Pardo, their spouses and their respective conjugal partnerships are officers and/or stockholders in their personal capacity or as conjugal partnerships.

18. Plaintiff has satisfied all of the procedural and administrative requirements and conditions precedent, to wit:

   a. Plaintiff filed timely written charges of discrimination with the EEOC;

   b. Plaintiff received corresponding Notices of Right to Sue from the EEOC; and,

   c. The complaint in this action was filed in this Court within 90 days from the receipt of the Notices of Right to Sue.

19. This Court has jurisdiction to hear and resolve this complaint.

20. The proper venue of this action is in this Court, as plaintiff worked

in Puerto Rico and defendant's illegal and discriminatory actions took place in the Commonwealth of Puerto Rico.

The Court's jurisdiction is not disputed.

**B. DEFENDANTS' STATEMENT OF THE ACTION AND JURISDICTION:**

Defendants' position: Defendants' position is, in essence, that the claims against them are unfounded and frivolous, and that no cognizable federal cause of action is alleged or will be established, and therefore, the state law causes of action are to be dismissed as well.

**III. PARTY'S FACTUAL VERSION OF THE CASE:**

**A.  PLAINTIFF'S FACTUAL VERSION OF THE CASE:**

1.     Plaintiff was an employee of Quantum Business Engineering Inc. and/or Quantum Business Engineering Inc. D/B/A QSI Quantum System Integrators.

2.     Plaintiff's title was ERP Business Manager.

3.     From the moment of hiring and until his dismissal, Plaintiff reported directly to Mr. Raul Rivera, and there was no formal or informal transition to reporting to Arturo Pardo.

4.     Plaintiff is, and was during his employment under defendant both, a Certified SAP Financial Consultant, and Certified SAP Business One Consultant.

5.     Commencing on or about May 2003, plaintiff was subjected to the following discriminatory action by defendants:

a.   Plaintiff was discriminated against by employer based on age.

b.   Plaintiff was discriminated against by employer based on national origin.

c.   Plaintiff was dismissed in retaliation for purported "whistle blowing" consisting of reporting to Immigration and Naturalization Service, U.S. Department of Justice employers use of undocumented aliens to perform services for its Puerto Rico clients.

6.   On or about January, 2003 plaintiff refused recommendations by Mr. Felix Ramirez to include as part of the ERP service line a scheme for importing and hiring as employees or contractors low priced undocumented foreign workers – mainly those from his native country of Venezuela, which at the time was undergoing civil unrest and a general work stoppage - to perform services for the defendants and its clients and potential clients within the Commonwealth of Puerto Rico.

7.   The illegal scheme included among other activities bringing in the undocumented foreign workers under tourist visas, or ultimately fraudulently obtained H-1B work authorization visas.

8.   On or about January, 2003, defendant effectively had underway the illegal scheme Felix Ramirez proposed to and refused by Plaintiff,

7

through a subcontractual agreement with Invezis.

9.      The proposed business alliance between defendant and Invenzis was initiated by Mr. Gonzalo Nuñez of SAP Andina and Caribbean, himself a foreign national from Uruguay working in the US without proper work authorization, and Felix Ramirez.

10.     Invenzis contracted directly with Defendant, Rafael Vidaillet representing Defendant, and Gustavo Quinelli, Uruguay national and personal friend of Gonzalo Nuñez, representing Invenzis. See Quantum/Invenzis business alliance contract submitted as part of "Defendant's Answers to Request for Production of Documents", dated December 9, 2004.

11.     Plaintiff was not involved in the selection of Invenzis as a business partner of defendant, nor was he involved in evaluating their work, performance, project plans, expense reports, travel plans or bid proposals. See such supporting documentation of Invenzis activities for defendant , submitted as part of "Defendant's Answers to Request for Production of Documents", dated December 9, 2004.

12.     On or about January, 2003, in search for someone who would be willing to effectively guide the above illegal scheme, defendant initiated negotiations with Arturo Pardo, another foreign national.

13.     On or about April, 2003, without complying with the US Department of Labor requirements, defendant filed a Labor Condition

8

Application for the position to be occupied by Arturo Pardo, which would effectively replace the duties and responsibilities carried out by Plaintiff. See defendant's Labor Condition Applications from US Department of Labor web site, submitted as part of "Plaintiff's Fourth Supplement to Required Initial Disclosures", Exhibit 6, dated February 3, 2005.

14.    On or about June, 2003, Mr. José Otero of SAP Andean and Caribbean, Account Manager responsible for the Public Sector industry, and a certain Mr. Levine, a representative from ONDEO, contacted Plaintiff in order to invite Defendant to a private biding process, under the strict conditions that Defendants participation did not involve Invenzis resources, or any other form of illegal worker scheme, and that Plaintiff be ultimately responsible for the execution of the project.

15.    On or about June, 2003, Plaintiff, believing he was acting under the express authority of his assigned duties as ERP Business Manager, assembled a team of local legitimate practitioners with authorization to work in the US to staff the ONDEO project.

16.    On or about June, 2003, Plaintiff requested help to complete the ONDEO staffing process from Rafael Vidaillet and Gilberto López, Defendant's President and Vice-president, respectively. See email communication from Plaintiff submitted as part of "Defendant's

Initial Disclosures", page 93, dated July 21, 2004.

17.     On or about June, 2003, Plaintiff was effectively removed from participation in the ONDEO biding process, and his duties where taken over by Invenzis Argentinean personnel, Diego Spalatti and Leandro Scavella. See email communication exchange submitted as part of "Plaintiff's Fourth Supplement to Required Initial Disclosures", Exhibit 3,  dated February 3, 2005

18.     On or about June, 2003, defendant filed a bid proposal for ONDEO of Puerto Rico for the SAP R/3 service line, with the participation and guidance of only illegal foreign nationals, namely Diego Spallatti, Arturo Pardo and Leandro Scavella.

19.     Defendants' ONDEO bid proposal was part of the illegal scheme described above, as all 15 resources submitted for consideration where foreign nationals without proper work authorization in the US. See bid proposal submitted by defendant to ONDEO project, obtained under subpoena from Aqueducts and Sewer Authority, and submitted as part of "Plaintiff's Supplement to Required Initial Disclosures", Exhibit 4, dated December 13, 2004.

20.     Plaintiff, upon learning of defendant's intention of staffing the ONDEO project illegally, alerted defendant of the legal exposure of submitting false statements under penalty of perjury regarding the employment eligibility of the workers to be assigned to the project.

Specifically, Plaintiff indicated exposure to criminal liability under Immigration and Naturalization Act (INA) section 274(a)(1)A)(v), which criminalizes any conspiracy to introduce within a U.S. Territory an illegal alien, EVEN IF THE ALIEN IS NOT ACTUALLY BROUGHT WITHIN THE TERITORIAL JURISDICTION OF THE US.

21.     Defendant requested and obtained an extension of time to submit the ONDEO bid proposal, and therefore had ample time to do so diligently. See email communication exchange submitted as part of "Plaintiff's Fourth Supplement to Required Initial Disclosures", Exhibits 1 and 2,  dated February 3, 2005.

22.     Plaintiff further warned defendant that there was also criminal liability under INA section 274A(a), that makes a crime employing unauthorized aliens, even if by contract, subcontract or exchange.

23.     The ONDEO bid was never awarded to any party, therefore defendant could not have suffered any prejudice that could be related to Plaintiff.

24.     Plaintiff was not involved in the above ONDEO de Puerto Rico bid proposal development, as he was employed by Defendants and dedicated at the time to the SAP Business One service line.

25.     On or about August 2003 plaintiff complained to defendants about defendants' practice and policy of hiring low priced undocumented

foreign workers to perform services for the defendants and its clients and potential clients within the Commonwealth of Puerto Rico, and the increased civil and criminal exposure it created for defendants and ultimately for its clients.

26.   On or about August, 2003, foreign nationals Felix Ramirez and Arturo Pardo initiated their conspiracy to remove Plaintiff from his position with defendant in order to be able to more easily bring in foreign nationals into the US without proper work permits. See Defendant's Initial Disclosures, page 99, where Arturo Pardo tries to concoct a sham to make the termination decision appear legitimate, proposing a "reorganization" theory, coupled with a performance issue excuse.

27.   On or around June, 2003, Plaintiff was charged with the responsibility of building the SAP Business One service line, and selecting the business partners which would assist defendant in carrying out the first business opportunities.

28.   Between June and September 2003, Plaintiff seldom had occasion to work out of the defendant's main office, as he was assigned to work in the Solasia of Puerto Rico implementation of SAP Business One, and all work occurred at the clients' premises.

29.   On or about September 4, 2003 one of the illegal workers under the fraudulent scheme described above, Diego Spallatti, traveling and

working under a tourist visa, was denied entry into the United States either at the San Juan or Miami port of entry.

30.   On or about September 4, 2003 plaintiff was discharged by defendants, in retaliation, believing Diego Spallatti was denied entry into the country as a result of Plaintiff's visit and complaint to the Department of Homeland Security.

31.   On or about September 15, 2003, defendants filed a fraudulent Labor Condition Application with the US Department of Labor, in order to "sanitize" Spallatti's lack of work authorization condition. See defendant's Labor Condition Applications from US Department of Labor web site, submitted as part of "Plaintiff's Fourth Supplement to Required Initial Disclosures", Exhibit 6,  dated February 3, 2005.

32.   Plaintiff's duties have subsequently been performed by Arturo Pardo and Diego Spallatti, both foreign nationals, and of a younger age than plaintiff.

33.   Defendants served plaintiff a letter of dismissal containing a pretext upon which defendants attempt to justify dismissal of plaintiff.

34.   Defendant embarks in a "job abandonment" theory to justify termination. See Defendant's Answer to First and Second set of Interrogatories, page 16, where defendants flip-flops and states that "Mr. Pardo never recommended Plaintiff's termination". However,

defendant inconsistently already had raised and after-the fact

performance issue as indicated above in Defendant's Initial

Disclosures, page 99.

35.     Plaintiff is pursuing a Juris Doctor (JD) degree at the University of

Puerto Rico since August, 2003, and is enrolled in the 4-year, part-

time evening program, which doesn't conflict with employment

obligations.

36.     The historical, objective, factual events that give rise to this cause

of action started in January, 2003.

37.     Plaintiff proposed writing a paper on the subject of this cause of

action during the semester starting August, 2004.

38.     Plaintiffs Law studies and the class project  proposal above, both

events occur 8 months, and 1 year and 8 months – respectively -

after Quantum started conspiring to facilitate the unlawful entry of

aliens, in violation of Immigration and Naturalization Act (INA)

section 274(a)(1)(A) and 274(a)(1)(B); INA section 262, failure to

comply with registration requirements; 18 U.S.C.A. sec. 1546, fraud

and misuse of Visa, permits and other documents; 18 U.S.C.A. sec.

371, conspiring to commit any offense against the U.S.A.; INA sec.

274A(b), unlawful employment of an alien; INA sec. 274 A(f)(1),

engaging in a pattern of previous violation, among others.

39.     Nevertheless, Defendants' previously describe activities of

sponsoring and promoting entry of foreign nationals to displace

Puerto Rican workers evidences bias by defendants-employer

favoring foreign employees and subjecting Puerto Rican nationals

to disparate treatment, disparate impact and discrimination on the

basis of their national origin.

40.    On March 17, 2005, Defendant offers yet another pretext or  theory

to discredit and undermine plaintiff in its "Request for Protective

Order", proposing that that Plaintiff is a "professional" student not

dedicated to the serious pursuit of work or employment.

41.    Defendant has continued to operate its SAP Business One service

line initiated under and by Plaintiff. See SAP Andean and Caribbean

publication "Perspectiva" submitted as part of "Plaintiff's Fourth

Supplement to Required Initial Disclosures", Exhibit 7,  dated

February 3, 2005.

42.    The above issue of the SAP publication celebrated the Solasia de

Puerto Rico project as the first SAP Business One project for the

whole Caribbean, with a large event that involved media coverage.

Defendant can't assert that the business line supported by Plaintiff

has been idle, when defendant can't clearly distinguish between a

SAP R/3 client, and a SAP Business One client. See Defendant's

Answer to First and Second set of Interrogatories, page 14, where

defendant answers: "SolAsia de Puerto Rico, Inc. was not a "SAP

Business One" project, but an R3 project.". Insert under Item 42:

43.   The SolAsia implementation led by Plaintiff was a resounding

success, as evidenced by the client testimonial covered in the

publication described in Item 41, above. See SAP Andean and

Caribbean publication "Perspectiva" submitted as part of "Plaintiff's

Fourth Supplement to Required Initial Disclosures", Exhibit 7, dated

February 3, 2005.

44.   On or around the end of August, 2003, Solasia requested a new

implementation of SAP Business One, to cover inter-company

transactions between itself and a wholly-owned subsidiary. This

was a business function not under the original scope of the first

Solasia Business One implementation.

45.   Solasia, as the pilot program for launching SAP Business One in

the Caribbean market, negotiated the second implementation free

of consulting charge from defendant with Arturo Pardo. This

contractual agreement has been requested by Plaintiff in the

discovery process, and has been facetiously denied by defendant

based on over-broadness and harassment claims.

46.   This second implementation of SAP Business One at Solasia, due

to it being a non-chargeable engagement, was one of limited scope,

which did not include the production of project plans or

documentation from the assigned consultants.

47.  Also see partial list of defendant's SAP Business One clients, engaged after Plaintiff was terminated submitted as part of "Plaintiff's Fourth Supplement to Required Initial Disclosures", Exhibit 1,  dated February 3, 2005.

48.  Defendant has also had the intention of operating the SAP R/3 service line, appearing in bidding processes or other business opportunities for the Office of Municipal Affairs (OCAM), Puerto Rico Government Employee's Retirement System (AEELA), Public Buildings Authority (AEP), Banco Popular of Puerto Rico, among others. See General Services Administration's documents related to bid No. 04-7-135, obtained under subpoena from the agency, and submitted as part of "Plaintiff's Supplement to Required Initial Disclosures", Exhibit 8, dated December 13, 2004.

49.  Defendant also showed its intention of operating the SAP R/3 service line by appearing – twice, as QSI, and as Quantum Business Engineering - at the Public Buildings Authority bid No. AEP-1003. The document management solution subject of this bidding process is an SAP R/3 application, and SAP Business One does not support such functionality.

50.  On or about March, 2005, defendant proposed to present one of its employees, Pedro Diaz, as a trial witness.

51.  On or around May, 2003, Pedro Diaz was employed by defendant,

17

after being unemployed for 8 months, after he had been terminated
by his previous employer, Automatic Data Processing.

52.    Pedro Diaz had no previous experience in  ERP implementations,
but was responsible for developing project plans and work-effort
estimates for client proposals. He relied for these tasks entirely on
Mr. Raúl Rivera.

53.    On or around July, 2003, Pedro Diaz had flunked the SAP Business
One certification exam twice, which is the limit established by SAP.

54.    On or around August 25, 2003, Pedro Diaz was summoned for a
meeting with defendants HR Manger.

55.    As consequence of the three conditions above, Pedro Diaz had
become increasingly unassertive in client sales situations, and he
himself speculated to Aixa Medina that he might be terminated in
the meeting with defendants HR Manager.

56.    On or about March, 2005, defendant solicited and enrolled the help
of SAP Andean and Caribbean – the worst offender in importing
foreign national illegal workers to Puerto Rico – in an effort to
discredit Plaintiff and his credibility.

57.    On or about March, SAP Andean and Caribbean has agreed to
provide as a false witness for this trial one of its employees, Sergio
Szpak, himself an Argentinean national who comes to the US to
work without authorization, and misleads the Immigration officials at

the US port of entry by indicating he enters the US for "tourism" purposes.

58.    SAP Andean and Caribbean currently imports foreign national illegal workers at its main office in City View Plaza in Guaynabo, and on several of its clients: Municipality of Caguas, Municipality of Carolina, Municipality of Guaynabo.

59.    SAP Andean and Caribbean is also proposing to staff projects at the Aqueducts and Sewer Authority, and the General Services Administration's bid No. 04-7-135 for the Office of the Commissioner for Municipal Affairs (OCAM) with foreign nationals without proper work authorization.

60.    Defendants employed in excess of 30 persons prior to and at the time of dismissal of plaintiff.

## B. DEFENDANTS' FACTUAL VERSION OF THE CASE:

Plaintiff was discharged for legitimate, non-discriminatory reasons and factors that were completely and totally unrelated to his age, race, citizenship, national origin or any other alleged protected activities or condition. Specifically, plaintiff was discharged for being absent without leave or authorization for over eight (8) consecutive business days, and for failing to report when required.  During this period he did not inform his employer of his whereabouts, and, moreover, he failed to attend a meeting to which he was summoned to discuss the status of his work and business affairs, and future opportunities. Under the circumstances of this case, his absence without leave was the equivalent of a voluntary

resignation.  Also, Plaintiff failed to responsibly execute his duties as a Quantum employee when he failed to timely advise his supervisors of the deadlines related to the Ondeo bid, which forced the company to scramble and prepare said bid proposal in a rush causing prejudice to Defendants. Plaintiff's allegations of discrimination are post hoc accusations used as a basis for this strike suit against Defendants, in hopes of attaining nuisance value settlement for his complaint. In other words, his complaint is frivolous.

Contrary to what is alleged, Plaintiff was not replaced by anyone and his former job functions were never reassigned.  In fact, the business line that plaintiff supported during his employ, namely the SAP R3 business line, has been idle since plaintiff's discharge. Because plaintiff was not replaced in any way or fashion, his claim fails to muster one of the key and essential elements of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973), and its progeny, for claims under the anti-discrimination statutes such as Title VII or ADEA. Plaintiff also alleges that U.S. employees at lower levels were replaced by foreign nationals. But this is immaterial to this case as the true scope of liability under Title VII, including in the context of national origin discrimination, is limited to comparable employees who are similarly situated to Plaintiff, and not at higher or lower levels. <u>Hutson v. McDonnell Douglas Corp.</u>, 63 F.3d 771, 777 (8th Cir. 1995)("statistical evidence is not probative of pretext [if] it fails to analyze the treatment of comparable employees"); <u>Roxas v. Presentation College</u>, 90 F.3d 310, 316-317 (8th Cir. 1996)(same); <u>Harvey v. Anheuser-Busch, Inc.</u>, 38 F.3d 968, 972 (8th Cir.1994) (plaintiffs must show that employees are "similarly situated in all relevant aspects"); <u>Jones v. Frank</u>, 973 F.2d 673, 676 (8th Cir.1992)(same); <u>Lanear v. Safeway Grocery</u>, 843 F.2d 298, 301 (8th Cir.1988)(same); <u>Nitschke v. McDonnell Douglas Corp.</u>, 68 F.3d 249, 252 (8th Cir. 1995)(Court may make statistical comparison of employees to

20

determine pretext, but must "analyze the treatment of comparable employees," or "comparably rated employees"); Bogren v. Minnesota, 236 F.3d 399, 406 (8th Cir. 2000)(same); see also LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 848 (1st Cir.1993) ("[S]tatistical evidence in a disparate treatment case, in and of itself, rarely suffices to rebut an employer's legitimate, nondiscriminatory rationale for its decision to dismiss an individual employee").

Moreover, plaintiff's discrimination claims are belied by the essential fact that he was hired and fired by the same decision-maker.  When confronted with claims when the same individual hired and fired a plaintiff within a reasonably short period of time, courts have stated that "it hardly makes sense to hire workers from a group one dislikes (thereby incurring the psychological costs of associating with them), only to fire them once they are on the job." Proud v. Stone, 945 F.2d 796, 797 (4th Cir. 1991). Therefore, where, as here, the hirer and firer is the same individual and the termination occurs within a reasonably short time span from the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer.  Id; See also Grady v Affiliated Central, Inc., 130 F.3d 553, 560 (2d Cir. 1997); Miller v. Citizens Sec. Group, Inc., 116 F.3d 343, 348 (8th Cir. 1997)(noting that "it is simply incredible" that defendant who hired plaintiff had suddenly developed an aversion to older people when he fired plaintiff less than three years later); EEOC v. Our Lady of the Resurrection Medical Center, 77 F.3d 145, 152 (7th Cir. 1996) (if defendant wished to discriminate against plaintiff she would have refused to hire her); Buhrmaster v. Overnight Transp. Co., 61 F.3d 461, 464 (6th Cir. 1995); LeBlanc v. Great American Insurance Co., 6 F.3d 836, 847 (1st Cir. 1993).  Accordingly, Plaintiff's claims for age discrimination and discrimination on reason of citizenship are

21

wholly without merit.

On the other hand, plaintiff's claims against the officers of the Company employer, Quantum, and their spouses in their individual capacities should be dismissed inasmuch these individuals are not "employers" under the applicable statutes. This is a strongly held principle in Title VII cases that should be upheld in this case as well. It is well established that individual employees cannot be held liable under Title VII. See Wathen v. General Elec. Co., 115 F 3d 400, 406 (6th Cir. 1997) ("Congress did not intend individuals to face liability under the definition of 'employer' it selected for Title VII"); Miller v. Maxwell's Int'l, Inc., 991 F.2d 583, 587 (9th Cir. 1993)(internal quotation marks omitted); Gary v. Long, 59 F.3d 1391, 1399 (D.C. Cir. 1995); E.E.O.C. v. AIC Security Investigations, Ltd., 55 F.3d 1276, 1281-82 (7th Cir. 1995); Grant v. Lone Star Co., 21 F.3d 649 (5th Cir. 1994).[1]

Additionally, Plaintiff's claim against Mr. Rafael Vidaillet's spouse should also be dismissed on the more elementary ground that they have not formed a conjugal partnership in light of a pre-nuptial agreement, and therefore, she cannot be held principally or subsidiarily responsible for the acts of Mr. Vidaillet.

Finally, Plaintiff has continued to focus and insist on alleging that Defendants have knowingly violated the immigration laws of the United States by hiring illegal aliens and allegedly using them to replace U.S. citizens. None of these allegations are true.  However, even if they were, they would be wholly irrelevant to the case at hand.

---

[1]This common interpretation of the scope of the agent clause in Title VII finds support in the Supreme Court's discussion in Meritor Sav. Bank v. Vinson, 477 U.S. 57, 72 (1986), wherein the Court stated that "Congress' [sic] decision to define 'employer' to include any 'agent' of an employer ... surely evinces an intent to place some limits on the acts of the employees for which employers under Title VII are to be held responsible." Id. at 72.

Whether Quantum complied or not with the requirements of the INS is a separate and wholly immaterial question in this purportedly Title VII, disparate-treatment case. The Supreme Court of the United States, in Espinoza v. Farah Manufacturing Co., 414 U.S. 86 (1973), made it clear that these are generally two separate issues and questions. The Court in Espinoza delineated the breadth of the statutory term "national origin" in Title VII and held that Title VII's prohibition against "national-origin" discrimination protects against discrimination in the workplace on the basis of "where a person was born, or, more broadly, the country from which his or her ancestors came." Id. at 88 (footnote omitted). Having accorded that interpretation to "national origin," the Supreme Court added that the reach of Title VII's ban against national-origin discrimination did not go so far as to prevent discrimination in employment solely on the basis of an employee's citizenship. Id. at 95. "To interpret the term 'national origin' to embrace citizenship requirements," stated the Espinoza Court, "would achieve the rather bizarre result of preventing [private employers] from insisting on United States citizenship as a condition of employment while the very agency charged with enforcement of Title VII would itself be required by Congress to place such a condition on its own personnel." Id. at 91.

If Plaintiff in this case seeks evidence revealing a differentiation in employee treatment due to citizenship, residence or domicile, and not because of membership in a class protected by the provisions of Title VII based on "national origin," then he lacks a cause of action under Title VII. Furthermore, lack of compliance with the INS is not a matter that this Court needs to address in a Title VII case. Indeed, the Court should note that even the Department of Homeland Security's Bureau of Citizenship and Immigration Service against which Plaintiff issued a subpoena, has objected to Plaintiff's discovery regarding

23

this matter as "irrelevant," noting that he "bears the burden of establishing that the information sought is relevant and essential to the proceedings for which they are sought." (See Docket No. 22, p. 2).

In other words, even though Plaintiff has alleged he suffered from disparate treatment discrimination on the basis of "national origin," as prohibited by Title VII, his evidence has nothing to do and in no way supports such allegations. More specifically, this appears to be a case of "reverse" discrimination. A case of "reverse discrimination" is generally considered one where a plaintiff attempts to establish that that circumstances support the position that the defendant is an unusual employer who discriminates, not against a minority, but against a "member of the majority." See Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 801-802 (6th Cir.1994).

In any event, the structure for evaluating a Title VII disparate treatment claim which applies in this case is by now well established. First, the plaintiff must make out a *prima facie* case of discrimination. If he does so, the burden then shifts to the defendants to articulate a legitimate, nondiscriminatory reason for their employment decisions. Finally, if the defendants articulate such a reason, the plaintiff must show that the proffered rationale was not the defendants' true reason, but instead was a pretext for illegal discrimination. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981), *citing* McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 804 (1973); Banerjee v. Board of Trustees of Smith College, 648 F.2d 61, 63 (1st Cir. 1981)(recognizing test in national origin discrimination context). It is important to note, however, that despite these intermediate evidentiary burdens, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the

24

plaintiff." Burdine, 450 U.S. at 253. The plaintiff in this case does not have any evidence to meet in any way his ultimate burden: that is, plaintiff cannot make out a prima facie case of national-origin discrimination, and neither can he establish that defendants had any other reason to terminate his employment than the legitimate and true reasons - principally his unexplained and unauthorized leave of absence for many days, as well as the poor performance of his obligations.

Because he lacks evidence of discrimination, plaintiff has instead attempted to shift the focus of litigation towards immaterial issues related to citizenship, domicile and residency and rules regulating such governmental matters. The central focus of a disparate-treatment claim of discrimination based on national origin or race, however, has always been whether a protected physical (or cultural) characteristic of the employee motivated the employment action taken by the employer. See Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993); Burdine, 450 U.S. 248, 252-56 (1981). Nothing in Title VII allows a plaintiff to claim "national origin" discrimination, focusing on the matters related to citizenship, domicile or residency (much less compliance with the laws regulating citizenship, domicile, or residency) because that is different, separate and immaterial matter. A claim based on such issues is simply "not cognizable under Title VII." Barnett v. Technology Intern., Inc., 1 F.Supp.2d 572, 576 -581 (E.D.Va. 1998).

The factual allegations in this case regarding reverse discrimination are, in many respects, extremely similar to the case of Barnett, id. In that case, the granted summary judgment dismissing plaintiff's discrimination claims under Title VII, which were supposedly based on "national origin." Plaintiff alleged that defendant had a policy of providing ninety

days notice of termination (or ninety days pay in lieu of such notice) to "non-US employees" that reflected disparate treatment of employees of American ancestry because every employee who did not receive such notice was of American national origin, that is, a U.S. citizen. The Court explained that plaintiff's claim, however, was in reality "based on a citizenship prerequisite," and therefore was "not cognizable under Title VII." Id., at 578. The Court based its holding on the Supreme Court's ruling in  Espinoza v. Farah Manufacturing Co., 414 U.S. 86 (1973), where the Court delineated the breadth of the statutory term "national origin" in Title VII. The Supreme Court held that Title VII's prohibition against "national-origin" discrimination protects against discrimination in the workplace on the basis of "where a person was born, or, more broadly, the country from which his or her ancestors came," and such protection did not go so far as to prevent discrimination in employment solely on the basis of an employee's citizenship. Id. at 95. ("Aliens are protected from illegal discrimination under [Title VII], but nothing in [Title VII] makes it illegal to discriminate on the basis of citizenship or alienage").

Based on this case, the Court in Barnett found that plaintiff had not established his burden of showing "a pretext for favoring those who are born outside the United States." Id. The Court further explained that plaintiff's "disparate-treatment claim, in essence, rests upon the allegation that he was  treated differently because of his residence or domicile. Accordingly, [his] allegation of disparate treatment under Title VII cannot survive summary judgment." Id. at 579. So, too, here is plaintiff's supposed claim under Title VII merely based on unfounded issues of citizenship, domicile or residency, which are irrelevant and not cognizable under Title VII, while lacking entirely any evidence of true "national origin" discrimination.

On the other hand, Plaintiff alleges to have suffered retaliation for allegedly complaining with the Immigration National Service regarding Quantum's supposedly illegal practice of hiring illegal aliens. But no evidence exists to establish that Quantum indeed hired any illegal aliens. But even if Quantum did, Plaintiff has completely failed to profer or provide any evidence that he actually filed a complaint or reported information with the INS. There is no evidence regarding the same, and thus, Plaintiff is unable to establish that he engaged in any protected activity for which relatiatory animus and actions could be born of.

Plaintiff's claim under the Age Discrimination Employment Act runs similar fate. Although Plaintiff complies with the protected age group (more than 40 years-old), there is no evidence to show that he was terminated because of his age. Merely belonging to the protected age-group of ADEA is, by itself, not enough to give rise to a claim under said statute.  Additionally, plaintiff was hired by Quantum when he was over 40.

In a key Supreme Court decision issued this week regarding the scope of ADEA, **Smith v. City of Jackson**,__ U.S. __, 2005 WL 711605 (Decided on March 30, 2005)(J. Stevens), the Highest Court of the land affirmed a district court that threw out claims under ADEA in summary judgment. Explaining that ADEA is more "significantly narrow[]" than Title VII, the Court held that "it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact. Rather, the employee is responsible for isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities." Id. The supporting rationale of the Court's opinion, in Justice Stevens' words, is that "failure to identify the specific practice being challenged is the sort of omission that could result in employers being potentially liable for the myriad of innocent causes that may lead to statistical

27

imbalances," which is obviously a result that neither Congress nor the Supreme Court support. The Court in Smith held that the test for employer liability under ADEA is of "reasonableness," and thus more difficult for plaintiffs to establish than under other statutes like Title VII, because the employer is entitled to make business and employment decisions that are based on a "reasonable factor other than age." The Court went further, however, when it stated that: "While there may have been other reasonable ways for the [defendant] to achieve its goals, the one selected was not unreasonable. Unlike the business necessity test, which asks whether there are other ways for the employer to achieve its goals that do not result in a disparate impact on a protected class, the reasonableness inquiry includes no such requirement." Id. In this case, there is no doubt that Plaintiff's allegations and evidence under ADEA completely fail to establish or identify the specific employment practices that any of the Defendants had which may have violated ADEA; worst, he has yet to point even to any generalized policy that may have lead to any ADEA violation regarding age in the workplace, or even against him. His claim under ADEA is even more frivolous when considering the reasons for his termination: principally his unexplained and unauthorized leave of absence for many days, as well as the poor performance of his obligations. There can be no question that Quantum was entitled to make the business and employment decision of considering him terminated. The decision was unquestionably based on factors other than age. The decision was unquestionably "reasonable," and meets the "reasonableness inquiry"-test which the Supreme Court adopted and announced this week in Smith. As in Smith, this Honorable District Court should toss out Plaintiff's claims under ADEA.

In sum, Plaintiff failed to responsibly execute his duties as a Quantum employee

when he failed to timely advise his supervisors of the deadlines related to the Ondeo bid. Some time later, Plaintiff was terminated because he was absent for more than eight (8) consecutive business days without leave. During these days he did not inform his employer of his whereabouts, and was not performing his duties, all in clear violation of company policy. He also failed to attend a meeting of which he was notified in order to discuss his performance and his future in the company. Plaintiff had ultimately abandoned his job, picked up his office, and never returned. He was thus deemed to had abandoned his job and resigned. Plaintiff was for all purposes acting as a non-employee. All that was left was for him to return company property, and that is why the company sent him a letter on September 4, 2003, notifying him of what was clear from his own actions: that he no longer was working for the company for all practical purposes, and asking him to return company property. These are all legitimate, non-discriminatory reasons for concluding an employer-employee relationship.

Finally, Plaintiff illegally obtained  confidential information from Quantum's computer database and servers prior to his termination, and has used such information for illegal and improper use.

## IV. EACH PARTY'S LEGAL THEORY OF THE CASE:

### A.  PLAINTIFF'S LEGAL THEORY OF THE CASE:

**1.**   Defendants Quantum Business Engineering Inc. and/or Quantum Business Engineering Inc. D/B/A QSI Quantum System Integrators are "employers" as defined by the Age Discrimination in Employment Act (ADEA) of 1967, as amended, 29 USC____.

2.  Defendants are required to take affirmative action to ensure that all employment decisions are made in a non-discriminatory manner.

3.  Defendants' illegal discharge of plaintiff place him under undue duress and constitutes unlawful and discriminatory deprivation of plaintiff's employment rights because of his age.

4.  Defendants overtly discriminated against plaintiff because of his age.  Discriminatory comments and treatment received by plaintiff were expressed and willful and part of a concerted plan to deprive plaintiff of his employment.

5.  At all times material, plaintiff owed defendant a duty not to discriminate against him.

6.  Plaintiff's decision to discharge defendant on the basis of his age, was wanton, willful and intentional, with malicious and reckless disregard for plaintiff's rights and sensibilities.

7.  Defendants have limited the employment opportunities of plaintiff thought its discriminatory and illegal actions.

8.  Plaintiff is entitled to receive compensation consisting of back and front pay and allowances.

9.  Defendants' conduct by and through its agents and servants,Rafael Vidaillet, Gilberto López, Félix Ramírez and Arturo Pardo constitutes a willful violation of law, inasmuch as the employment decisions concerning plaintiff were based in whole or in part upon

plaintiff's age.

10.   Defendants Quantum Business Engineering Inc. and/or Quantum Business Engineering Inc. D/B/A QSI Quantum System Integrators are "employers" as defined by Title VII of the Civil Rights Act of 1964, as amended, 42 § 2000 et seq.

11.   Defendants' illegal discharge of plaintiff place him under undue duress and constitutes unlawful and discriminatory deprivation of plaintiff's employment rights because of his national origin.

12.   Defendants overtly discriminated against plaintiff because of his national origin.  Discriminatory comments and treatment received by plaintiff were expressed and willful and part of a concerted plan to deprive plaintiff of his employment.

13.   Defendants' decision to discharge plaintiff on the basis of his national origin, was wanton, willful and intentional, with malicious and reckless disregard for plaintiff's rights and the sensibility.

14.   Defendant's decision to discharge plaintiff on the basis of his national origin had an economic motive since undocumented foreign workers received a lower scale of compensation than workers of U.S./Puerto Rico origin.

15.   Defendants have limited the employment opportunities of plaintiff thought its discriminatory and illegal actions.

16.   Plaintiff is entitled to receive compensation consisting of back and

Defendants' conduct by and through its agents and servants, Rafael Vidaillet, Gilberto López, Félix Ramírez and Arturo Pardo constitutes a willful violation of law, inasmuch as the employment decisions concerning plaintiff were based in whole or in part upon plaintiff's national origin.

17.   Defendants' illegal discharge of plaintiff place him under undue duress and constitutes unlawful and discriminatory deprivation of plaintiff's employment rights because of his purported whistle blowing activities.

18.   Defendants overtly discriminated against plaintiff because of his whistle blowing activities.  Discriminatory comments and treatment received by plaintiff were expressed and willful and part of a concerted plan to deprive plaintiff of his employment.

19.   Defendants' decision to discharge plaintiff on the basis of his whistle blowing activities, was wanton, willful and intentional, with malicious and reckless disregard for plaintiff's rights and the sensibility.

20.   Defendants' conduct by and through its agents and servants, Rafael Vidaillet, Gilberto López, Félix Ramírez and Arturo Pardo constitutes a willful violation of law, inasmuch as the employment decisions concerning plaintiff were based in whole or in part upon plaintiff's purported whistle blowing activities.

21.    Defendants Quantum Business Engineering Inc. and/or Quantum Business Engineering Inc. D/B/A QSI Quantum System Integrators are "employers" as defined by law.  .

22.    Defendants' illegal discharge of plaintiff places him under undue duress and constitutes unlawful and discriminatory deprivation of plaintiff's employment rights because of his national origin and purported whistle blowing activities.

23.    Defendants overtly discriminated against plaintiff because of his age, national origin and whistle blowing activities.  Discriminatory comments and treatment received by plaintiff were expressed and willful and part of a concerted plan to deprive plaintiff of his employment.

24.    At all times material, defendant owed plaintiff a duty not to discriminate against him.

25.    Defendants' decision to discharge plaintiff on the basis of his age, national origin and whistle blowing activities was wanton, willful and intentional, with malicious and reckless disregard for plaintiff's rights and the sensibility.

26.    Defendants' conduct by and through its agents and servants, Rafael Vidaillet, Arturo Pardo and Gilberto López, constitutes a willful violation of law, inasmuch as the employment decisions concerning plaintiff were based in whole or in part upon plaintiff's

age, national origin and whistle blowing activities.

27.    Defendants Quantum Business Engineering Inc. and/or Quantum Business Engineering Inc. D/B/A QSI Quantum System Integrators are "employers" as defined by law.

28.    Defendants' illegal discharge of plaintiff place him under undue duress and constitutes unlawful and discriminatory deprivation of plaintiff's employment rights because purported whistle blowing activities.

29.    Defendants overtly discriminated against plaintiff because of his purported whistle blowing activities.  Comments and treatment received by plaintiff were expressed and willful and part of a concerted plan to deprive plaintiff of his employment constituting retaliation against Plaintiff.

30.    At all times material, defendants owed plaintiff a duty not to retaliate against him.

31.    Defendants' decision to discharge plaintiff on the basis of his purported whistle blowing activities, was wanton, willful and intentional, with malicious and reckless disregard for plaintiff's rights and the sensibility.

32.    Defendants' conduct by and through its agents and servants, Rafael Vidaillet, Gilberto López, Félix Ramírez and Arturo Pardo constitutes a willful violation of law, inasmuch as the employment

decisions concerning plaintiff were based in whole or in part upon a retaliatory animus.

33. Defendants' action violate the federal and local legislation invoked here.

34. The following jurisprudence is cited in support of the legal and factual contentions hereinabove:

   a. Watson v. Forth Worth Bank and Trust, 487 U.S. 977 (1988);

   b. Whidbee, et al., v. Garzarelli Food Specialties, Inc., et al., 223 F. 3d 62 (2nd Cir. 2000);

   c. Leniart v. C & S Distributors, Inc., 1993 WL 214559 (Conn.Super.);

   d. Vargas v. Fullerbrush Company of Puerto Rico, Inc., 336 F. Supp. 2nd 134 (USDC-PR 2004);

## B. DEFENDANTS LEGAL THEORY OF THE CASE:

See Defendants' Factual Version of the Case.

## V. UNCONTESTED MATERIAL FACTS:

### A. JOINT PROPOSED UNCONTESTED MATERIAL FACTS:

1. Plaintiff commenced employment on October 1, 2002.

2. Melendez' original compensation was $65,000.00 per year.

3. In March, 2003, his compensation was increased to $126,000.00.

4. This new compensation was based on a yearly salary of $84,000.00, a draw account in the yearly amount of $36,000.00 and

a car allowance in the yearly amount of $6,000.00.

5.     Plaintiff was dismissed on September 4, 2003.

6.     Plaintiff was first supervised by Raúl Rivera when he began working for Quantum.

## B.  DEFENDANTS' PROPOSED UNCONTESTED MATERIAL FACTS:

1.     The decision of hiring Plaintiff was ultimately made by Rafael Vidaillet.

2.     The decision to terminate Plaintif was also made by Rafael Vidaillet.

3.     Quantum did not win or obtain the bid for the Ondeo project in 2003. Quantum never won a bid or obtained a sale of the SAP R3 product.

4.     When discharged, Plaintiff's supervisor was Arturo Pardo.

5.     Plaintiff's position has not been reassigned to anyone.

6.     Quantum paid for Plaintiff's SAP training.

## VI. CONTESTED ISSUES OF LAW:

### A.  PLAINTIFF'S CONTESTED ISSUES OF LAW:

a.  Whether there was discrimination against Melendez on the basis of age;

b.  Whether there was discrimination on the basis of national origin;

c.  Whether there was retaliation against Melendez for denouncing Defendants illegal scheme of substituting older Puerto Ricans for younger illegal aliens;

    **d.** Whether the Court should Strike Defendants' Answer and
Counterclaims and Enter a Default Judgment Against Defendants:

    **Plaintiff's Position:** Defendants utterly failed to comply with discovery
herein:  all answers to discovery where late, short, incomplete and
contradictory.  Defendants did not attend at least two Rule 26
meetings.  Defendants also failed to duly and timely supplement their
initial disclosures.  Defendants failed to produce their witnesses to
announced depositions.  Under these circumstances, Defendants
answer and counterclaim should be stricken and a default judgment
should be entered against Defendants as specifically provided by Rule
37(d) of the Federal Rules. (*See* Docket Document # 49.) In turn,
Defendants contend that unknown, secret personal problems allegedly
endured by their legal counsel on or about December, 2004, operate
as a complete panacea for Defendants purposeful and complete
derailment of discovery herein, gutting and rendering meaningless this
Court's discovery schedule.

## B.  DEFENDANTS' CONTESTED ISSUES OF LAW:

    a.  Whether Plaintiff has alleged and stated a cognizable claim under Title
VII, for "national origin discrimination"?

    **b.**  Whether Plaintiff has alleged and stated a cognizable claim under
ADEA?

    c.  Whether plaintiff has alleged a cognizable claim for retaliation?

**d.** Defendants' response to Plaintiff's Point D, above: **Defendants' Position**: Defendants have complied with its duties to discover notwithstanding certain issued addressed to the Court during an in-chamber conference held in December of 2004. Contrarywise, plaintiff has not even answered the first and second request for production of documents served on him **nearly 5 months ago**, back in November of 2004. These requests are still outstanding and, thus, he has no clean hands to allege that Defendants have not complied with discovery, or to request sanctions of any kind under Fed.R.Civ.P. 37. Dates for Rule 26 meetings were unilateraly imposed by Plaintiff, and Defendants have responded to such dates offering other alternate dates, having received no response by Plaintiff's counsel. Supplemental disclosures under Rule 26 have been provided, and that is an ongoing obligation that has no time limit, so there can be no untimeliness. Finally, the Defendants have announced their trial witnesses at this Pretrial stage, which is precisely the moment to do so. The rules of civil procedure do not state otherwise. Plaintiff's faxed notice of depositions was done at last-minute, immediately following the Court's determination denying a JOINT motion for extension of time to extend the discovery cut-off date, and merely a few days prior to the cut-off date, knowing that there was truly no time to prepare for the same or conduct the same, as they jointly indicated to the court in the joint motion. It is improper to

claim otherwise at this stage.

## VII. DEPOSITIONS INTENDED TO BE USED BY EACH PARTY:

No depositions were ever taken in the present case.  Thus, no depositions will be used during the trial of the present case.

**Defendant's position:** Defendants believe that good cause exists for the Court, in fairness and justice, to allow a short term prior to trial to conduct depositions, particularly the deposition of plaintiff, as explained in previous motions filed with the Court regarding this matter. See Fed.R.Civ.P. 26(f) (order implementing management of discovery "may be altered or amended whenever justice so requires"); see also Fed.R.Civ.P. 16(b) (scheduling order subject to modification "upon a showing of good cause"); Fed.R.Civ.P. 16(e) (pretrial orders subject to modification).

Furthermore, allowing depositions would also certainly fullfil the spirit and letter of Fed.R.Civ.P. 1, and the overriding purpose of discovery, which is the ascertainment of the truth, so as to allow parties to properly and fully prepare for trial. Indeed, Defendants believe that if the Court allows depositions, this will put the parties in a better position to assess the possibility of settlement in this case, and trial could very well become unecessary. Furthermore, the spirit and goal of the discovery rules is not to win at playing the game of check-mate –as Plaintiff would seem to believe-- but to allow a fair process and full preparation for trial on the merits. See Macaulay v. Anas, 321 F.3d 45, 53 (1st Cir. 2003)(quoting United States v. Procter & Gamble Co., 356 U.S. 677, 682 (1958), regarding the purpose of pretrial discovery which is to "make trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the

fullest practicable extent"); see also Seattle Times Co. v. Rhinehart,  467 U.S. 20, 34 (1984) ("[l]iberal discovery is provided for the sole purpose of assisting in the preparation and trial, or the settlement, of litigated disputes").

**VIII. WITNESSES INTENDED TO BE USED BY EACH PARTY:**

**A.  PLAINTIFF'S WITNESSES:**

1.  William E. Melendez

    a.   Address: Co-defendants's Records should show Melendez exact address.

    b.   Telephone:  (787) 379-7011;

    c.   Plaintiff will testify in support of his allegations in the Complaint and in the answer to counterclaim; and

    d.   Needs interpreter.

2.  Raúl Rivera Herrera

    a.   Address: Co-defendants' Records should show Rivera's exact address;

    b.   Telephone: Co-defendants's Records should show Rivera's exact telephone number;

    c.   This witness will support all allegations contained in the complaint; and

    d.   Needs an interpreter

3.  Aixa Medina

    a.   Address: Co-defendants' Records should show Medina's

exact address;

b.      Telephone: Co-defendants' Records should show Medina's

exact telephone number;

c.      This witness will testify in connection with allegations

contained in paragraph 3, of the counterclaim (personal and

confidential information of QBE employers), as well as to the

Second Claim for Relief of the Complaint (Discrimination on

the basis of National Origin); and

d.      Needs and interpreter.

**4.**     Andrew Hamilton

a.      Address: Co-defendants' Records should show Hamilton's

exact address;

b.      Telephone: Co-defendants' Records should show Hamilton's

exact telephone number;

c.      This witness will testify with regards to Codefendants'

consulting practice.

**5.**     José A. Rodríguez

**a.**      Address: Co-defendants' Records should show Rodríguez'

exact address;Telephone:

**b.**      Co-defendants' Records should show Rodríguez' exact

telephone number;

**c.**      This witness will testify with regards to Codefendants

discriminatory practices on the basis of nationality; and

**d.**     Needs and interpreter.

**B.  DEFENDANTS' WITNESSES:**

**1.**     Rafael Vidaillet, will testify in support of the defense of the claim and the counter-claim.

**2.**     Arturo Pardo – will testify, without limitation, concerning plaintiff's job duties and that before September 2, 2003, he was never appraised by plaintiff of any issues or complaints concerning his belief that the Company was violating immigration statutes.

**3.**     Sergio Szpak - will testify that before September 4, 2003, Plaintiff told him he no longer worked for Quantum.

**4.**     Pedro Diaz – will testify that he received a telephone call in the days prior to Plaintiff's abandonment of employment and termination from Plaintiff, warning Mr. Diaz that he would be fired, which turned out to be false; and another telephone call from Aixa Medina giving him a similar warning.

**5.**     Jose Pichardo - Jose Pichardo is one of Quantum's clients. He is the President of Solasia Puerto Rico, the client that plaintiff was supposedly servicing the week of August 25, 2003, and when he was terminated. Mr. Pichardo's testimony would, in general and without limitation, cover several topics, to wit, that Plaintiff would visit Solasia only one or two times a week, and generally after 5:00 PM, and would

be at Solasia for no longer than one or two hours at a time. He will
also testify that to the best of his recollection, employees of Quantum
that visited Solasia were capable of receiving telephone calls on their
mobile phones, including Mr. Melendez.

## IX. EXPERT WITNESSES INTENDED TO BE USED BY EACH PARTY:

## A.     PLAINTIFF'S EXPERT WITNESS:

If discovery is reopened, expert witnesses will then be duly announced.

## B.     DEFENDANTS' EXPERT WITNESS:

Defendants do not foresee the use of any expert witnesses at this time, but
reserve the right to use such an expert pursuant to Fed.R.Civ. 26.  Logically, the
engagement by defendants of any expert witness depends on Plaintiff's compliance with
Fed.R.Civ.P. 26 regarding expert witnesses. Plaintiff has yet to produce any expert
witness report. As soon as Plaintiff complies with his obligations under Rule 26,
Defendants will then be in a position to make a reasonable determination as to the need
for an expert witness of their own in this case. Defendants reserve the right to depose
Plaintiff's expert witness after the expert report is produced and full compliance with
Rule 26 is had.

## X. CLAIMS AND DEFENSES WAIVED BY EACH PARTY:

### A.     PLAINTIFF'S POSITION:

Melendez does not waive a single claim or defense.

### B.     DEFENDANTS' POSITION:

Defendants do not waive any claim, defense or privilege.

**XI. PENDING MOTIONS:**

**A. ACCORDING TO PLAINTIFF:**

The following docket documents are motions pending before this court: 21, 22,

23, 28, 31, 32, 33, 34, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 53, and 55.

**B. ACCORDING TO DEFENDANTS:**

Docket Nos. 21-23, 27-29, 33, 37-41, 43 and 44.

**XII. ITEMIZED STATEMENT OF SPECIAL DAMAGES:**

None.

**XIII. TECHNICAL WORDS TO BE USED DURING THE TRIAL:**

1.   **ERP:**  Enterprise Resource Planning, or business function software that integrates all transactional data of an enterprise in a single relational data base.

2.   **SAP R/3:**    ERP software solution for complex business environments, covering everything from manufacturing, production planning, accounting and distribution functions. Typically used by multi-site, remote processing business concerns which bill business volume of over $500 million per year .

3.   **SAP Business One:**    Economic, striped down version of SAP R/3, covering financial, distribution and minor assembly type business functions. Designed for the small and medium business market segment, or business concerns which bill a business volume form a few million to under $500 million a year.

44

4.    **Network Security Policy:** Describes an enterprise's technological components, together with management policies and procedures, to prevent unauthorized access to the enterprises information assets. Will typically include an "Incident Response System", and document when security breaches have occurred, and what remedial actions have been taken to rectify the occurrence, and corrective action to prevent them in the future.

This list may be supplemented by both Plaintiff and Defendants.

## XIV. EXHIBITS:

### A.    BOTH PARTIES EXHIBITS:

| No. | Marked | Admitted | Description |
|---|---|---|---|
| I | | Ex | e-mail from Melendez and addressed to Pardo dated September 2, 2003 |
| II | | Ex | Melendez' chart of compensation package |

### B.    PLAINTIFF'S EXHIBITS:

| Plf. No. | Marked | Admitted | Description |
|---|---|---|---|
| 1 | Id. | | EEOC Discrimination Claims for Age National Origin and Retaliation |
| 2 | Id. | | Right to Sue Letters |
| 3 | | Ex. | Quantum's Letter hiring Melendez dated September 24, 2002 |
| 4 | | Ex. | Signed Termination Letter dated September 4, 2003 |
| 5 | Id. | | Sworn Declaration by Raul Rivera Herrera |
| 6 | Id. | | Defendants' Roster of Employees |
| 7 | Id. | | Melendez U.S. Passport |
| 8 | Id. | | Invenzis Expense Report dated March 17, 2004 |
| 9 | | Ex. | e-mail from Melendez and addressed to Lopez dated September 3, 2003 |

| Plf. No. | Marked | Admitted | Description |
|---|---|---|---|
| 10 | Id. | | e-mail from Melendez and addressed to Vidaillet and Leon dated September 3, 2003 |
| 11 | Id. | | Co-defendants' employee evaluation chart. |
| 12 | Id. | | Performance appraisal of Myrna Collazo dated July 2, 2003. |
| 13 | Id. | | Minutes of meeting with Myrna Collazo Haddock dated August 11, 2003. |
| 14 | Id. | | Co-defendants' performance appraisal form. |
| 15 | Id. | | Cingular's Telephone bill statement regarding Melendez's mobile dated September 15, 2003. |
| 16 | | Ex. | Draft of Memo from Arturo Pardo to William Melendez dated September 2, 2003. |
| 17 | Id. | | Job applications made by Melendez from September 21, 2002, to Marcxh 17, 2004. |
| 18 | Id. | | Job applications made by Melendez from March 18, 2004, to May 16, 2004. |
| 19 | Id. | | Co-defendants' advertising as computer systems security experts. |
| 20 | Id. | | Co-defendants' employee directory dated August 15, 2003. |
| 21 | Id. | | Co-defendants' performance appraisal handbook dated March 17, 2004. |
| 22 | Id. | | Arturo Pardo's chart of compensation package dated July 25, 2003. |
| 23 | Id. | | Expense Statement |
| 24 | Id. | | Travel schedule of Leandro Scavella and Diego Spallatti. |
| 25 | Id. | | Monthly time sheet for Diego Spallatti. |
| 26 | Id. | | Monthly time sheet for Leandro Scavella. |
| 27 | Id. | | Quantum Business Engineering bid proposal for ONDASAP. |
| 28 | Id. | | SAP Business One certification. |
| 29 | Id. | | E-mail dated November 8, 2004, from Carlos González SAP. |
| 30 | | Ex. | General Services Administration's documents related to bid No. 04-7-135. |
| 31 | | Ex. | Melendez's SAP Certification as a Financial Consultant. |
| 32 | Id. | | List of Defendants' clients contracting for the installment of Business One. |

| Plf. No. | Marked | Admitted | Description |
|---|---|---|---|
| 33 | Id. | | Record which makes reference to Defendants' labor certification application for H1B visas for Defendants' foreign employees found in the Department of Labor website. |
| 34 | Id. | | Letter dated June 17, 2003, and for the signature of Mr. Gilberto López. |
| 35 | Id. | | E-mail sent to Melendez on June 19, 2003. |
| 36 | | | E-mail sent to Freddy Flores on June 19, 2003. |
| 37 | Id. | | Document titled "Respuestas a Consultas del Pedido de Ofertas del Soporte para la Solución ONDA SAP" and dated June, 2003. |
| 38 | Id. | | Download from the U.S. Department of Labor website referring to H-1B Specialty (Professional) Workers. |
| 39 | Id. | | Download from the U.S. Department of Labor website referring to H-1B Specialty (Professional) Workers. |
| 40 | Id. | | Labor Certification Applications submitted by Defendants. |
| 41 | Id. | | Article titled "Solasia de Puerto Rico: Un Proyecto Exitoso" which appeared on SAP Perspectiva, Year 6, No. 2, 2003. |
| 42 | Id. | | Payments Records Related to Invenzis |
| 43 | Id. | | Documents related to Arturo Pardo |

## C.   DEFENDANTS EXHIBITS:

| Defendants' Letters | Marked | Admitted | Description |
|---|---|---|---|
| A | | Exh. | "Acuse de Recibo" de William Meléndez, Re: "Manual de Empleado". |
| B | | Exh. | "Manual del Empleado y Reglas de Conducta". |
| C | | Exh. | Letter to CPA, William Meléndez from Rafael Vidaillet, Re: Employment Offer. |
| D | | Exh. | Email from Gilberto López to Rafael Vidaillet, Re: William Meléndez revised economic |

| | | | |
|---|---|---|---|
| | | | package. |
| E | | Exh. | Letter to William Meléndez from Félix Ramírez, Re: ERP Business Manager (salary, fringe benefits, and responsibilities). |
| F | | Exh. | Curriculum Vitae of William Meléndez. |
| G | | Exh. | Letter to William Meléndez from Ivette León (employment termination letter) |
| H | | Exh. | Memorandum to William Meléndez from Arturo Pardo, Re: Attendance |
| I | | Exh. | Email from William Meléndez to Gustavo Quinelli, Re: Quantum Project BE. |
| J | | Exh. | Email from William Meléndez to Rafael Vidaillet, Re: Status Ondeo. |
| K | | Exh. | Email from Raúl Rivera to Gustavo Quinelli, Re: QBE Contract Review. |
| L | | Exh. | Email from Raúl Rivera to Félix Ramírez, Re: Strategic Alliance SAP. |
| M | | Exh. | Email from William Meléndez to alfonso.mogollon@sap.com y gonzalo.nunez@sap.com , Re: Business One. |
| N | | Exh. | Email from William Meléndez to Rafael Vidallet, Re: Next week Agenda. |

| Defendants' Letters | Marked | Admitted | Description |
|---|---|---|---|
| O | Id. | | Email from Posse, Esteban to rvida@quantumbe.com, wmelendez@quantumbe.com,Re: SAP Business One |
| P | | Exh. | Email from William Meléndez to Posse Esteban, rvida@quantumbe.com copy to Alfonso Mogollon y framirez@quantumbe.com , Re: SAP Business One. |
| Q | | Exh. | Email from Gilberto López to Ivette León, Re: Status Report. |
| R | | Exh. | Email from Gilberto López to Ivette León, Re: Status, as of May 8, 2003. |
| S | | Exh. | Email from William Meléndez to framirez@quantumbe.com, copy to |

| | Marked | Admitted | Description |
|---|---|---|---|
| | | | rvida@quantumbe.com , and Gilberto López, Re: Profile Consultor Business One. |
| T | | Exh. | Email from Rafael Vidaillet to William Meléndez, Re: RFP Support ONDA SAP 05 |
| U | | Exh. | Email from Gilberto López to William Meléndez, copy to Rafael Vidaillet, Arturo Pardo, Félix Ramírez, Re: RFP ONDA SAP V05 Support. |
| V | | Exh. | Email from William Meléndez to Rafael Vidaillet, Re: Invenzis |
| W | | Exh. | Email from Arturo Pardo to Félix Ramírez, Gilberto López y Rafael Vidaillet, Re: William Meléndez' situation. |
| X | | Exh. | Email from William Meléndez to Arturo Pardo, copy to Ivette León, Re: Medical Appointment. |
| Y | | Exh. | Email from Arturo Pardo to William E. Meléndez, copy to Ivette León, Re: Immigration Department, E.E.U.U. |
| Z | | Exh. | Email from William E. Meléndez to Rafael Vidaillet and Ivette León, Re: Meeting cancellation. |
| AA | | Exh. | Email from William E. Meléndez to Gilberto López, Re: Meeting date. |

| Defendants' Letters | Marked | Admitted | Description |
|---|---|---|---|
| BB | | Exh. | Email from William E. Meléndez to Félix Ramírez, copy to Raúl Rivera, Re: Meeting date. |
| CC | | Exh. | Invoice from Verizon Wireless Account No. 687015749, client No. 1-787-553-8297. |
| DD | Id. | | UPR Academic Transcripts |
| EE | Id. | | Resume William Meléndez |
| FF | Id. | | SAP Overview |
| GG | Id. | | E-mail from Rafael Vidaillet to Ivette León, Re: Compensation Plan |
| HH | Id. | | Letter from Rafael Vidaillet to William Meléndez economic offer, duties and responsibilities. |
| II | Id. | | ERP Business Manager Position Profile |

| JJ | Id. | | QSI Detailed Job Description |
|----|-----|--|------------------------------|
| KK | Id. | | Interoffice memo from Raúl Rivera to Rafael Vidaillet, Re: Solasia Project Review Report |
| LL | Id. | | "Alianza de Negocios para la Práctica de Servicios SAP" Business Partner Agreement |
| MM | Id. | | E-mail from William Meléndez to Rafael Vidaillet, Re:  Status Ondeo |
| NN | Id. | | E-mail from Raúl Rivera to Félix Ramírez, Re: Modelo carta Invenzis |
| OO | Id. | | E-mail from William Meléndez to R. Rivera and R. Vida, Re:  Training SAP, ABAP and BASIS |
| PP | Id. | | E-mail from Gilberto López to William Meléndez, Re:  Sales and Service Partner Agreement |
| QQ | Id. | | E-mail from William Meléndez to A. Pardo, Re:  Business One Capacitation Sales personnel |
| RR | Id. | | E-mail from William Meléndez to Gilberto López, Re:  RFP Soporte ONDA SAP VO5 |
| SS | Id. | | E-mail from Arturo Pardo to William Meléndez, Re: Beginning of Pilot Project |
| TT | Id. | | E-mail from Arturo Pardo to William Meléndez, Re:  Schedule and progress of Pilot Project |
| UU | Id. | | E-mail from Loumarie Ortíz to Pedro Díaz, William Meléndez, Re:  SAP Business One |
| VV | Id. | | E-mail from Bernice Epstein to William Meléndez, Re:  Boston University Summer classes |
| WW | Id. | | E-mails log (email message in MIME Format, 03/26/04) |
| XX | Id. | | E-mail from MSN Technical Support to R. Vida, Re: Identity Fraud |
| YY | Id. | | E-mail from Ivette León to Rafael Vidaillet, Re:  Confidential documents published |
| ZZ | Id. | | Email from William Melendez to R. Vidaillet, G. Lopez re: RFP Soporte ONDA SAP VO5 |

## XV. PROPOSED CONTESTED MATERIAL FACTS:

### A.  PLAINTIFF'S PROPOSED CONTESTED MATERIAL FACTS:

This part is not required by the Court's model of a PT Order.

### B. DEFENDANTS' PROPOSED CONTESTED MATERIAL FACTS:

1.   Plaintiff picked up his office and left it empty prior to September 4, 2003.

2.   On or before September 4, 2003, Plaintiff told a man named Sergio Spak, a SAP manager, that he no longer worked with Quantum.

3.   Plaintiff illegally obtained confidential information from Quantum's computer database and servers prior to his termination for illegal use.

4.   Plaintiff failed to responsibly execute his duties as a Quantum employee when he failed to timely advise his supervisors of the deadlines related to the Ondeo bid, which forced the company to scramble and prepare said bid proposal in a rush causing prejudice to Defendants.

## XVI. DISCOVERY:

### A.   PLAINTIFF'S POSITION:

This section is not part of this Court's model PT Order.  Notwithstanding, please see **Docket Document # 49**.

In addition, on or about November 10, 2005, Defendants served upon Defendants a First and Second Request for Production of Documents.  On or about December 10, 2004, Melendez answered said request for production of documents. Among other defenses, Melendez argued that the requests for production of documents were addressed to a person not a party herein.  Indeed, Requests for Production of Documents served upon Melendez were addressed to a certain Ms. Ivette Berríos on behalf of PRAICO.  On December 20, 2004, we held a Rule 26 conference with Counsel

for Defendants in order to discuss this matter.  During said Rule 26 meeting all parties agreed that Defendants would first correct their requests for production of documents. In turn, Melendez agreed to duly answer the same once the corrected requests for production of documents were served upon Melendez.  On March 8, 2005, counsel for defendants finally sent corrected sets of requests for production of documents to Melendez.  Indeed, it took defendants approximately two (2) months and sixteen (16) days to duly correct their request for production of documents.   Once again defendants evidence herein their total disregard for the discovery scheduling of the present case. Notwithstanding, Melendez is willing to answer the same within a reasonable time as afforded by the Rules of Civil Procedure.  If this Court desires, these facts may be evidenced.

**B.    DEFENDANTS' POSITION:**

Defendants have served several discovery requests on Plaintiff, some of which are still outstanding without response from Plaintiff.

Defendants also have asked the Court for additional time to conclude discovery based on reasons provided to the Court in chambers and in sealed motion.  Defendant's discovery will be limited to taking depositions from plaintiff and his announced witnesses. Defendant's motion is pending ruling by the Honorable Court.

**XVII. OTHER MATTERS**

**B.    PLAINTIFF:**

**1.** The trial of the present matter may last three (3) days.

**2.** Melendez objects to Messrs. Sergio Szpak and Pedro Díaz as fact

witnesses for Defendants.  Said names were mentioned to Melendez for the first time ever on March 22, 2005, during the legal counsels meeting to discuss the Proposed Pretrial Order.  Moreover, José Pichardo was announced for the first time ever today on April 1, 2005.  Once again, Defendants continue to disregard the Rules of Civil Procedure and this Courts Discovery scheduling.

**B.   DEFENDANTS:**

1. Defendants estimate that trial will take no more than three (3) days, and that Defendants' presentation of their case will take a day and a half (1 1/2).

**WHEREFORE**, based on the foregoing it is respectfully requested that the Court consider and accept the parties Joint Pretrial Order.

**RESPECTFULLY SUBMITTED.**

n San Juan, Puerto Rico, this 1st of April, 2005

**LAW OFFICES OF CUADROS & CUADROS**
701 Ponce de Leon Ave., Suite 215
San Juan, Puerto Rico 00907
Tel. (787) 725-2652
Fax: (787) 724-3820
e-mail: mcuadros@cuad-law.com


**By: s/ Miguel A. Cuadros**
      **Miguel A. Cuadros**
      **USDC-PR No. 114184**
On Behalf of Plaintiff


**LAW OFFICE OF ENRIQUE A. BAEZ GODINEZ**
701 Ponce de Leon Ave., Suite 215
San Juan, Puerto Rico 00907
Tel. (787) 722-5347
Fax: (787) 724-3820

e-mail: baez@cuad-law.com


**By: s/Enrique A. Baez**
     **Enrique A. Baez**
     **USDC-PR No. 214909**
On Behalf of Plaintiff

**KEVIN M. ACEVEDO-CARLSON, ESQ**.
P.O. Box 193251
San Juan, Puerto Rico 00919-3251
Tel. (787) 615-5074
Fax: (787) 751-1645
e-mail: kacevedo@alf-ac.com


**By: s/Kevin M. Acevedo-Carlon, Esq.**
     **Kevin M. Acevedo-Carlson, Esq.**
     **USDC-PR No. 218609**
On Behalf of Defendants

## CERTIFICATE OF SERVICE

    **WE HEREBY CERTIFY THAT** on this same date we electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send a notification of such filing to the following: **Alcides A. Reyes-Gilestra** and **Beatriz Annexy Guevara.**

                    **LAW OFFICE OF ENRIQUE A. BAEZ GODINEZ**

                  By:s/ Enrique A. Baez
                        Enrique A. Baez